State your names for us. Mr. Harris, do you want to save some of your time for rebuttal? Yes. Five minutes. Okay. And just to remind you both to keep your voices up. You've got April Harris. Whenever you're ready, Mr. Harris. May it please the Court. I'm Assistant Appellate Defender David Harris on behalf of the appellant William Deshaun Strickland. As I did in the briefs, I will refer to my client by his middle name, Deshaun. That's how her witness is referred to him, and that distinguishes him from other defendants in this case. So the caption on the briefs is William Strickland? William Strickland, yes. Is that the name he was indicted under? Yes. Yes, he was. But the decedent has the same name, and there are other witnesses involved with the last name Strickland. So the briefs, and today I'll refer to him by Deshaun, and that's what the witnesses called him throughout the trial. Okay. Thank you. We raised two issues on behalf of my client in the briefs. The denial of the accomplice witness instruction and the use and introduction of cell site location information taken from his phone in violation of the Fourth Amendment. I'd like to address both today. The accomplice witness instruction should have been given based both on Danny Armstrong and Loretta Smith. There was probable cause to believe both could have been involved in this offense, and their testimony was crucial to the state's prosecution and to my client's conviction. Danny admitted on the stand that he agreed on multiple occasions to carry out this killing in exchange for money. He ultimately produced the murder weapon for the police, and the prosecutor argued in closing that my client could be accountable for Danny as the principal. Loretta heard the discussion about the killing, accompanied Deshaun to the scene, maintained a close affiliation afterward, had no negative reaction, and did not come forward to the police and didn't tell her latest story until almost a month later after being arrested for this offense, for this murder, charged and held overnight. She finally changed her story to implicate Deshaun and was let go. So this story we heard was her get-out-of-jail-free card. The jury should have been told to view their testimony with heightened suspicion and caution in accord with pattern instruction 3.17 as defense counsel requested. The court's failure to do so was an error that prejudiced this trial, prejudiced Deshaun, was not harmless beyond a reasonable doubt, and requires reversal and remand for a new trial. For this wasn't the only error that affected the juror's view of witness credibility, though. The state was allowed to introduce the cell site location information, which it has conceded was obtained in violation of Deshaun's Fourth Amendment rights. This information corroborated and made her more believable and compounded the error of not instructing the jury to, as a matter of law, treat these witnesses' testimony with suspicion and caution. These errors were not harmless. It's not just that these were suspicious witnesses who had a motive to say whatever it took to avoid liability. The identification in this case was limited. There was one occurrence witness. He saw two people leave the scene and couldn't identify them. This is Mr. Edward Cleveland. And yet he saw Deshaun just a few hours later at the family house and didn't recognize him as one of the offenders. Danny was evasive at trial. He, the judge, excused the jury for a moment to threaten him with contempt for being evasive and not answering questions truthfully. And this wasn't, as the state suggested in its brief, because he wasn't trying to pin this on my client. It was because he was trying to get the gun. He had this absurd testimony that he got the gun. He hid it somewhere before he was arrested. He called his friend K.O. to get the gun for the police, but he didn't tell K.O. where the gun was. He didn't know how K.O. knew where the gun was, and yet he still knew to call him. He wouldn't give his full name or he didn't know his name, and yet this K.O. was able to produce the gun for the police. Loretta also gave some absurd testimony that she accompanied my client to this murder. She knew he was supposedly going to go kill his grandfather, and she decided to take a nap in the car while he did it. She also testified that DeShawn asked the grandmother, Janet, for a gun in the days leading up to the offense, and yet said she also had seen him every day for a month leading up to this with the murder weapon. And she also was contradicted by Philomena Stitz on certain points about whether they went to her house before the offense or just after, and whether after the offense Philomena said my client came in, asked to use the phone, and said, why can't I come home, as if he has no idea what's happened. And Loretta only said that he asked, is he dead. So it shows there's a contradiction. She's trying to pin this on my client, avoid liability, just as she did to get out of prison. The committee notes say the defendant is entitled to a 317 instruction if the witness rather than the defendant could have been the person responsible for the crime. And that's not the case here, is there? Maybe with Armstrong, Blackie, right, but not... I don't think there's any, and based on the inconsistencies just described, based on Loretta flipping her story to finally let herself out of jail, I don't think there's any clear picture with any certainty of what happened. But it does say if they could have been responsible for the crime in the committee notes. Could have been responsible as, I believe in the case law says, could have been indicted as either principal or accountable. Well, that's number two. Sorry, that's number two. Because number one is whether they could have been responsible. Number two is if the witness admits being present at the scene of the crime and could have been indicted either as principal or under a theory of accountability, but denies involvement. So that's what you're saying. And that fits Loretta, yes. She accompanied him to the scene of the crime, denied involvement, but she knew what was going to happen. Well, she wasn't at the scene of the crime. I mean, she was at the scene as much as any getaway driver is, which I... Well, where was the car in relation to the murder? It was down the alley around the corner, and he got out to get her. Not there? Well, not at the scene of the crime. I think that would qualify as the scene of the crime. Any getaway driver, I think, would be at the scene of the crime. But she would be a getaway passenger, wouldn't she? Well, I'm not saying necessarily she was a getaway driver, but she's in the car. The car is waiting, and she's as much present as the getaway driver. Who, by all intents and purposes, was asleep at the switch. Exactly, yes. Which I think just is an absurdity in her testimony that she would just take a little nap... Wouldn't that be something the trial judge would consider? I'm sorry? Wouldn't that be something Judge Lynn would have considered, having sat there and listened to her testimony? He considered all that, and he denied the obstruction, right? Sure, he said he considered the evidence, but he also said that she denied participating, which isn't necessarily the standard. I think there is an Illinois Supreme Court case Well, the Supreme Court in Cobb said, you know, reversed and remanded for a new trial based on the denial of the obstruction, even though the witness claimed she didn't know about a planned robbery, which is a claim that she's not involved. She didn't know what was happening. She was just present and in the car and drove home away. There was an appellate case cited in the B.S. Lewis that said, quotes directly, the quote is, even if the witness denies involvement in the crime, and the committee notes say if they deny involvement in the crime. So her denial isn't the basis to reject this obstruction, and I think it was discussed in the reply brief in response to the State's argument about the sufficiency of the evidence. We're not drawing inferences in the light most visible to the State here. The only question is whether there was some evidence, however slight, to warrant the defense request of obstruction. Well, but it is an abuse of discretion standard, so it's whether any judge could have decided that there wasn't enough evidence. I think that we counted a maximum of evidence to show that both of these witnesses could have been accountable or even principled in Danny Armstrong's case for this offense. Because these errors were not harmless. Yes, I'm sorry. Now, the judge in his ruling, which is on page 14 of the State's brief, says, I do not believe that the evidence that the jury heard would have this instruction applied to it. Labetta Smith never said that she was an accomplice. I don't know of anything that she did testify to. It would be something that she could be indicted for, which is part of the committee comments. It goes on to say that it's for flippers. But should the judge be making his or her decision on this issue based on testimony at the trial or based on the totality of the evidence? I believe it would be either based on the totality of the evidence introduced at trial or perhaps an offer of proof of what the defense may have intended to introduce if there was further evidence after the jury instruction conference. But if the jury is not aware of any evidence of their involvement, then I don't think that would be necessarily an appropriate basis. But there was plenty of evidence from their mouths either in court or in front of the grand jury that was introduced substantively that made them accountable. I mean, even Labetta, there was a case cited in the briefs, People v. Walker, where this was a defendant, not just about the instruction, overheard the planning but did not leave, was present and did not intervene and had no negative reaction like Labetta, did not report it to the police, and accepted proceeds from the defense. That person was convicted based on accountability. We're just asking for some slight evidence to believe there was probable cause to believe she was accountable. I think that is more than satisfied for both Labetta and definitely Danny Armstrong, who admitted several times he agreed to commit this murder for hire. At trial, he said, I didn't really mean it. Well, Deshawn didn't think he meant it either, right? No, it wasn't Deshawn. Well, I thought he did say something that was interpreted as saying. He was playing. He was playing, that was it, interpreted as saying that he didn't believe his mother. Yeah, I'm not sure how that statement would be interpreted. But, yeah, Danny, his denial at trial only related to one of these instances. He said he was approached in December about it, in December of 2012. The grand jury testimony was that he agreed to carry this out for $2,000, and then at trial he said, I didn't really mean it. Subsequently, it came out during the rest of his questioning that he also met early in February and agreed to do this and later in February and agreed to do this. And he didn't say he was joking those times. He didn't say he wasn't serious those times. And those times he discussed taking a bag worth $1,000, getting paid by the grandmother another $1,000, so his denial, even if it's in any way credible, is not complete. Can you address the cell records, please? Yes. The state has conceded that this was a Fourth Amendment violation, obtaining these without a warrant. And the state's only argument that it shouldn't have been suppressed is that the officers had a good faith basis to rely on binding appellate authority. That's the only basis they identify in their brief. And they immediately admit they found no binding appellate authority. As I pointed out in the brief, all their authority was from outside jurisdictions. Not only were those foreign jurisdictions, those cases were all issued after the search in this case. The search in this case, the data was at least obtained by March 29, 2013, according to the state's disclosure that's mentioned in the record. Well, could you take the position that because there's an absence of any case law, why would any law enforcement official think that a warrant was required back in 2014? No, and I think for two reasons. First, the default is there's a warrant requirement and you need an exception. And then the default for a Fourth Amendment violation under MAP v. Ohio is suppression unless there's an exception. So the default isn't if there's no law in the area, we can do whatever we want. We don't want police officers on the street deciding to interpret the Constitution however they see fit and different officers will interpret it differently. You need binding appellate authority authorizing the action. Well, it was not his phone, correct? It was shared with Janet Armstrong, yes. It was not his phone. I believe the testimony was they shared a cell phone. Because he didn't have one. He used his grandmother's phone, right? Yes, they shared the cell phone. Okay, but there's no evidence that it was his phone. He used his grandmother's phone. That's what the evidence is. Right, the evidence I think showed joint authority over it. The state hasn't suggested there was no basis for this. I understand that they haven't suggested it, but I'm trying to figure out why he would have an expectation of privacy over records of someone else's phone. That's what that is. Well, I believe it was their shared phone. He used it. She used it. They traded it back and forth as seen in this case. Perhaps if this joint authority over it could give, if Janet consented to a search, she might not have a basis to challenge it, but he otherwise has a reasonable expectation of privacy in this phone because he uses it just like she does. What about the recognition by our Supreme Court in Lafleur that the legal landscape, or as Justice Pierce sort of referred to, the absence of any legal authority that says you can't provides a good faith basis? And I know you say warrants are the assumption, but we're not talking about going into a house. We're talking about the grand new frontier of technology, and I don't think there is necessarily a presumption that a warrant is required. Well, thank you for that question. That gets me to my second response, which I had forgotten to address. Yes. I don't think there was, I think the case file showed that officers should be careful here. The, I mean, Katz itself about reasonable expectation of privacy was phone information. In 2012, or earlier, it was Tyler was found that using technology to obtain information, even from a public location, is subject to the Fourth Amendment warrant requirement. In 2012, there was Jones about location information. Tracking an offender's location required a search warrant. So I think by this 2013 search, there was plenty of authority showing that for this location tracking, a warrant is required. And, again, the state, you know, the exception is based on binding appellate authority. There's no binding appellate authority authorizing this. The state didn't cite any case that an officer here could have relied on, both because it was not binding. We're relying on third-party record cases. You know, law enforcement subpoenas bank records, and in some third party, and those third-party records reveal evidence that is incriminatory against a now defendant. I mean, what standing would you have, or what basis would you have to say they have no right to get a third party's records and use those third-party records to implicate me in a crime? Because this is personal information, and I think since at least Katz, people have had a reasonable expectation of privacy, even in public locations, or information that is shared publicly, that was in a phone booth. But the third-party doctrine relating to phone information in Smith v. Maryland, the court was explicit in saying that it was allowing this information and not considering it a search based on the limited capabilities of a pen register. And here we don't have limited capabilities. Did they use this evidence in this case of location? The way I read the evidence was that the cell records indicated that the phone was in proximity to the home address. It wasn't used to say the defendant made a phone call or received a phone call. It was just that the phone was in the area. Correct. Right. So how is that in the case, really? Well, they spent a lot of time on this, using it to bolster Levetta's testimony about what happened in the hours leading up to the incident, about driving to different parties around the South and I believe West Side. They spent a lot of time detailing what towers it pinged in those hours. And so it was certainly important to the state to introduce this. Perhaps because Levetta was such a weak witness, they wanted to build her credibility in these hours to make her credible at the time of the shooting. So the state went through the time and expense to bring in an FBI expert. They certainly thought it was important. If there are any questions, if you want to save some time. Yes, I would. Yes, I would ask for either or both of these issues that both touch on witness credibility. I would ask for reversal and remand for a new trial. Thank you. Thank you. Good afternoon, Your Honors, and may it please the Court. Assistant State's Attorney Douglas Harbath on behalf of the people of the State of Illinois. With regard to the first issue, the trial court properly declined to issue an accomplice witness instruction to the jury because the evidence did not establish that either Levetta Smith or Danny Armstrong was indictable for the murder of William Strickland. Neither witness was accountable or offensible in the offense because neither Smith nor Armstrong actually participated in the planning or the commission of the offense. At most, Smith, as reprehensible and as repugnant as her behavior was, at most she was aware of the plan. She was present near the scene when the defendant murdered his grandfather. While this, she failed to disapprove of his plan, and like I said, it may be reprehensible. Illinois law is very clear that that does not render her accountable for his actions. And with regard to Danny Armstrong, while the defendant took great strides to recruit, to attempt to recruit Danny Armstrong to assist in the murder, Danny Armstrong never actually assisted. He never participated in the planning or commission of the offense, and for that reason he was not accountable. So therefore, the trial court, based on that evidence, properly exercised its discretion in declining to issue the accomplice witness instruction. You agree that the standard is only that they would have had probable cause to indict. Right, and I guess I wouldn't use the word only. Counsel refers to all we need is slight evidence or some evidence, and while that is true to obtain other jury instructions, to get a self-defense instruction, for example, this instruction is very different. It is the only one, to my knowledge, that requires a showing of probable cause to indict. And in that case, it makes it even more of an appropriate exercise of discretion because the trial court found specifically, I believe it was Justice Griffin pointed out in the record, that the judge pointed out that there was no evidence that put her, that suggested that she was in harm's way of being charged. And I think that sort of encapsulates her involvement. She did not have involvement. She was a bystander, and should she have spoke up? Should she have done something to prevent it? But she was charged, wasn't she? She was not charged. She was arrested for this offense. If I understand correctly, yes. She did indicate her cross-examination, and I guess that brings up a good point.  Correct. She was arrested for this offense. She initially had lied to the police. She eventually told the truth, and the defense had a heyday with her in terms of credibility. Cross-examined her at great length, as they did with Danny Armstrong, portrayed them, and properly so, as reprehensible people that didn't do anything to save this man. But that doesn't make them accountable. It certainly doesn't make them a principal. And with regard to Lovetta Smith, while it may not in a vacuum seem likely that she just happened to fall asleep during the murder, while it took place, she had already been asleep. Remember, she'd been going to parties all night. She'd been drinking, and she went home to Lovetta Smith's apartment. She fell asleep, and the defendant woke her up. She was sleepy. So when the defendant went to commit this murder, regardless of whether or not she actually was asleep, she did not go to the actual scene, which was at least a block away or half a block away. She didn't handle the gun. She didn't act as a lookout. She did not act away as a getaway driver. As this court pointed out, perhaps she was a getaway passenger. That does not make her accountable. To be accountable, the statute requires that either before or during the commission of an offense, and with the intent to promote or facilitate that commission, she solicits aides or vets or attempts to aid another. Well, we don't have either of those for either of these witnesses. Certainly, with regard to Danny Armstrong, he didn't intend to promote, and he didn't actually promote the commission or the planning of the offense. And for that reason, they're not accountable. And as this court pointed out during my opponent's arguments, the defendant himself, he told Philomena Stips and he told his girlfriend that he knew that Danny was playing. I think it's the exact word where he's playing, he's bullshitting. So he knew that he wasn't participating. And I don't know if it's made clear in the briefs. Mr. Armstrong's cell phone was five and a half miles away from the murder, so there can be no doubt that he was actually the other person running away from this murder. And that was information that the trial court was aware of. So he wasn't accountable, and he certainly wasn't a principal. So there's no other evidence in the record beyond rank speculation that Danny Armstrong was the other guy that participated in this murder. It was running away from Mr. Strickland when he was gunned down. To the extent that Danny is portrayed as having disposed of the murder weapon, he didn't dispose of the murder weapon. He asked to have it because he wanted it for protection. And whether or not you believe that or not, the fact that he came into possession, and even if he did hide it, that would make him at most an accessory after the fact. And the Supreme Court in Peeble v. Caffey, C-A-F-F-E-Y, expressly held that the accomplice witness instruction need not be given when a witness is not involved in any way until after the commission of the offense. So an accessory after the fact, and this is a quote from the opinion, does not warrant the instruction unless the witness was involved in the planning of the commission. So even if he did take possession of the gun and he had something to do with hiding the gun, it doesn't make him accountable for the murder itself. And likewise with regard to Loretta Smith. Even if her involvement after the offense, even if her lying to the police could be construed, and it could be construed as obstruction, she lied to the police. Maybe that's what she was going to be charged with. Obstruction by lying to the police would be an accessory after the fact, so to speak. It would be a vest after the murder itself. So for all those reasons that the trial court, and I hasten to point out that while it's not insurmountable, the abuse of discretion is the most deferential standard. And I think on this record, even if reasoned minds could disagree based on this record whether or not the instruction should have been given, this quote should not portray the trial judge as having acted arbitrarily or fancifully or acting unreasonably such that no reasonable person would take the view adopted, which is the standard for an abuse of discretion. The test, excuse me. And even if it should have been given, in light of the extensive cross-examination where the defense was fully permitted and did portray these witnesses as repugnant, their credibility was fully attacked. And there's several cases, I believe all four of them, Garner, Daniels, Ford, Howard, they're all first district cases, finding that the failure to give this instruction is harmless and it's ameliorated, it's cured, so to speak, by the giving of the general credibility instruction as well as the instruction regarding the impeachment value of prior inconsistent statements. And both those instructions were given in this case. Just a cursory review of the defense closing argument, the defense portrayed Black as an accomplice. He's the one that Black has armstrung. He hatched the plan. Smith was arrested and she was charged with murder. This goes on and on. So the jury was under no illusion that these individuals were saints, that they were honorable in some respect, that they were virtuous. And it's already been argued in our brief, but the cases upon which they rely, including Walker and Cobb and Winston, in those cases there is a getaway driver. There's someone sharing the proceeds. There's someone that's helping out, that's participating. Helping out is the very definition of accountability. With regard to the Carpenter, and I told myself I wasn't going to say the Crawford issue. I've done it several times referring to this, the Carpenter issue, where the CSOI, the cell site location information, was obtained prior to Carpenter based on universally sanctioned conduct, the good faith exception should apply. In this case, the CSOI was obtained five years before Carpenter, and it was based on an objectively reasonable good faith belief that it was lawful, given the legal landscape and the constitutional norm at that time. Where there's no, in La Flores, it's very clear that where there's no bad faith, there's no misconduct, there's no recklessness or grossly negligent conduct to deter, there's no basis to apply this exclusionary rule. That is the sole basis, and that's what the Supreme Court said in Harrington and Davis, and that's what our Supreme Court has repeated in Burns and especially in La Flores. And I'd ask this Court to pay close attention to all the language in La Flores. The sole basis for the exclusionary rule is to deter future Fourth Amendment violations. It is to prevent, not to repair. And so another way of saying that would be not to punish. Well, now we know that Carpenter says you can't get this information without a search warrant. Well, you don't apply that retroactively just to punish the police when they're relying on a legal landscape that universally, universally sanctioned the wantless acquisition of CSOI. And I'm not aware of any decisions. Certainly every appellate, federal appellate court decision, every federal circuit to address this on the merits held that the third-party doctrine applied and that a warrant was not required. And I guess I would take exception to our argument is not that there was binding authority in Illinois. There was no authority in Illinois. And this Court's confronted with a case of first impression in Illinois right now. This is the first case that I'm aware of, except for Herring. And Herring did not reach the merits of the retroactivity of the, excuse me, the good faith doctrine, whether it applies to Carpenter. In this case, and I think it's telling, I'd like to point out to this Court that, and this is no fraud against appellate counsel. He didn't include, the defense didn't include this issue in their opening brief before Carpenter came down. I think that's a tacit recognition. And this was preserved. The defense in this case raised this issue at trial, so it was fully preserved. But the defense on appeal in their opening brief didn't see a reason to bring this issue up. I think that's a tacit recognition of the state of the law at the time. It was clear there was no basis to suppress this evidence, no basis to, no requirement that the police obtain a search warrant before getting this. The language that I'd like to direct this Court to specifically in LaFleur is that, so there was no merit to the notion that the good faith exception does not apply where the police reasonably rely upon the legal landscape at the time, even though there are no state law cases addressing the issue. I think that answers it right there. There's no deterrence to be gained by telling the police they may not rely on Federal Circuit court decisions, just because the Circuit covering the statute, excuse me, covering the state in which the investigation is ongoing, lacks its own precedent. Well, that describes Illinois, and it describes the Seventh Circuit. The Seventh Circuit punted on this issue, and, of course, there was no Illinois decisions. There's simply no bad faith or misconduct. On the contrary, the police in obtaining the grand jury subpoena for this CSLI relied on the legal landscape and the constitutional norm, the widely understood state of the law at the time. It is the opposite of bad faith. It's the opposite of misconduct, which is the only reason that reviewing courts and trial courts apply the exclusionary rule. And even if this Court, and I'm not suggesting this Court not apply the good faith exception, even if it defines that the good faith exception does not apply, I think it was Justice Pierce pointed out that, well, how appropriative was it? How damaging was this evidence? Well, it certainly wasn't nearly as damaging as the calls themselves, showing the calls between the defendant and Danny Armstrong, and making the 911 call. It was the calls themselves that corroborate the witnesses, not the location, because obviously the defendant, William Strickland, lived at the address with the deceased William Strickland, and so did Janet Strickland. Did the evidence of the origin of the phone call and the recipient of the phone call, in other words, phone to phone, did that evidence come from the cell phone record and from the cell tower records, or did those come from business records of the carrier? I don't think that nuance is spread of record. I will tell you what I do know about the call detail records is what they're called. The call detail records include the location metadata, and then they also include what I refer to as regular phone records, and I would like to point out that the defense doesn't dispute the admissibility, so they are separate records. I don't know whether they were obtained separately, though. The defense does not dispute the admissibility of basically the pen registers? Correct. They weren't contesting the cell tower records as to the location of where the phone was at the point in time? That's correct. That's correct, and even after Carpenter, the records, as you said, the pen register records of incoming and outgoing calls, that is still subject to the third-party doctrine. It's not impacted by Carpenter. What's your response to the defendant's argument that all the cases you cite, the federal circuit court cases, are actually after this search? I guess I was actually trying to find whether or not that's accurate. I know a few cases that were decided at least right around the same time as the acquisition in this case, and some were decided beforehand. There was a case of a northern district in Indiana, which is in the Seventh Circuit. It was a 2010 case. Again, that's a district court, federal district court decision, it's not a circuit court. Rogers, which is a northern district bill, and I was 2014. I don't recall offhand what the precise date the records were recovered. There was a federal circuit court case, the Fifth Circuit decided in 2013, which presumably was before this was acquired, upheld that based on the third-party doctrine. Well, the Fifth Circuit was the circuit that Carpenter came out of, right? Carpenter was the Sixth Circuit. I believe Michigan and Ohio. So I guess even if they post-date the acquisition in this case, there was still no basis before then. There was no authority saying, don't do this, you need a warrant for this. And then, of course, all these cases came down and said, of course, you don't need a warrant. It's not a Fourth Amendment search. So I don't think that's really an important distinction. So I guess for all those reasons, for those three, and I believe unless this court has any further questions, we'd ask you to affirm the judgment of the defendant's murder conviction. Thank you. Thank you. I would apologize. Out of the 15 cases, I did not notice one of them was before the search. So if officers are reasonably relying in good faith on an Eastern District of Indiana case. A little bit of a fiction that the police are reading reported cases. We need to identify something to rely on. The counsel talked about how there was no bad faith in this case in obtaining this information. Bad faith isn't the test. The rule is exclusion. The test is whether there was a good faith exception to exclusion. We suppress evidence even without bad faith to deter police misconduct or accidents and even searches that don't necessarily rely on bad faith. We're looking for an exception. The state is trying to prove an exception to MAP's exclusionary rule. And I would note that the Supreme Court decided riley, it was after the search, but decided riley holding the warrant requirement for cell phone information that is shared to third parties, cell phone providers. And it was after the search, but it shows how the Supreme Court interpreted its own case law to show that any purported interpretation by officers here was unreasonable. And we also cited some cases in the briefs that showed that officers were obtaining warrants for this in Illinois at the time and before the search. Now going back to the inspection issue, counsel pointed out that the jury heard the flaws pointed out by defense counsel. But the defense counsel's argument is no substitute for an instruction by the judge. That is the juror's duty to apply extra scrutiny and caution with regard to these witnesses' testimony. There's an instruction like this for a reason. Defense counsel always argues that witnesses were not credible. There's a reason this instruction exists. And it is very different to hear a judge sitting on the bench telling the juror what the law is and the law is you treat these witnesses with caution and suspicion. Do you think there's any curative value to IPI 102 that tells the jury that they're the judge of the credibility of the witnesses and to take into account that? No. That's given in every case. In every case, I mean, we've cited a number of cases where there was a reversal based on the manatee denial of 3.17. Just telling the jurors they're the judges of believability isn't enough. The Supreme Court has determined that in certain cases they need to hear more and they need to hear it from a judge that as a matter of their duty to follow the law, they need to apply caution and suspicion to these witnesses. And I would note that the jury acquitted my client of personally discharging a firearm. So even the jury believed there's a shooter still out there. There was a second person seen by Edward Cleveland. We have Danny Armstrong who agreed to commit this murder for hire. So there's still... Or they believed there wasn't enough evidence to establish that he pulled the trigger. Sure. Sure, yes. It wasn't proven beyond reasonable doubt that he was the person who pulled the trigger. Let me ask you a question if I may. Counsel said that you're not contesting the evidence as to which phone called which phone. Correct. You're only contesting the locational evidence of where the phones were at certain periods of time. Correct. I think the phone number dialing a certain phone number files under the pen register cases in Smith versus Maryland. So you're just attacking the locational evidence coming from the cell tower information. Correct. Okay. Counsel also mentioned that LaVetta was not charged. The only evidence we have in the record is her testimony that she was charged. We don't know... It wasn't explored any further at trial and there was no rebuttal put on. But even if she wasn't charged and maybe she was just an officer signed a complaint and she thought that was some full charge, she was arrested. The police believed they had probable cause to arrest her. Danny Armstrong was also arrested and was held. He produced the gun for the state and then was brought to the grand jury. His testimony wasn't as explicit that he was arrested for this murder, but he was arrested in this investigation. She was not arrested. She was arrested for this murder. She was arrested for the murder? Yes. Was she charged with the murder? She said she was charged for this murder. That's the only evidence we have in the record. There's, I don't think, any dispute that she was arrested for this murder. And she was let go when she changed her story and implicated Deshawn. So is the standard for giving the instruction probable cause at the time of the trial that there's still probable cause? I mean, obviously or not obviously, but somebody thought there was probable cause to arrest these people, so there was probable cause then, theoretically. Sure. But the instruction depends on whether there's still probable cause at the time of the trial, I assume. That's a good question. I'm not sure. I think probable cause early on is enough, especially when the only change in circumstance and the only change in the evidence is that she changed her story to exonerate herself. I don't think that makes probable cause evaporate. And just a note about that, Danny's phone was five miles away during the time of the offense. That doesn't mean he wasn't there. It just means he might be a wiser criminal than we sometimes see to leave his phone behind. If there are no further questions, I would, again, ask for reversal and remand for a new trial. Thank you. Very well argued, as always, from both of your offices. We will take this matter under advisement.